# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

| | | |
|---|---|---|
| MONSOON, INC., and MOON, SUN & STARS, INC., | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. _____ |
| BIZJET INTERNATIONAL SALES & SUPPORT, INC. | ) ) ) | **JURY TRIAL DEMANDED** |
| Defendant. | ) ) | |

## COMPLAINT

Plaintiffs Monsoon, Inc., and Moon, Sun & Stars, Inc. (collectively, "Monsoon") file this Complaint against Defendant BizJet International Sales & Support, Inc. ("BizJet"), a Lufthansa Technik Group company.

## SUMMARY OF CLAIMS

This lawsuit arises out of BizJet's (a) grossly negligent servicing of Monsoon's Gulfstream G450 airplane (the "Aircraft"), and (b) intentional misrepresentations regarding crucial safety-related information and other material information before, during, and after the work was performed. BizJet's misconduct literally put lives at risk and caused Monsoon millions of dollars in damages.

The servicing at issue was a mid-life inspection for the Aircraft's Rolls-Royce Tay 611-8C engines. Rolls Royce requires a mid-life inspection after 10

years of engine operation.  At that time, Monsoon's was one of the first, if not the

first, Tay 611-8C engine to reach the 10-year mark.  To induce Monsoon to give it

the job, BizJet intentionally and significantly over-stated its capabilities and

equipment, both orally and in the proposal and other documents provided to

Monsoon.  BizJet also misstated the costs and "turn-time" for completing the work.

BizJet was eager to get this work because performing the mid-life inspection could

lead to millions of dollars in additional business from other owners of aircraft with

these engines.  BizJet said whatever was necessary, including outright

misrepresentations, to persuade Monsoon to award it the work.  BizJet said

whatever was necessary, including outright misrepresentations, to ensure that

Monsoon continued the mid-life inspection with BizJet despite overruns, delays,

and shoddy execution of the inspection.  BizJet reaffirmed its original

misrepresentations after Monsoon's acceptance of its proposal in order to keep the

work.

        BizJet's work turned out to be disastrous.  BizJet did not have the expertise

it represented it possessed.  BizJet made false representations as to the progress of

the work, the details of the work performed, and the inspection process, upon

which Monsoon relied.  BizJet charged far more than promised and, when it

delivered the Aircraft far later than promised, Monsoon learned that BizJet's work

was shoddy and resulted in dangerous engine operation.  This was confirmed by

Gulfstream, the Aircraft's manufacturer, and Rolls Royce, the engines' manufacturer. Ultimately the mid-life inspection of one of the engines had to be re-performed by Rolls Royce.

To compound its pattern of misrepresentation, BizJet issued a press release trumpeting its first mid-life inspection on this type of engine, falsely representing to Monsoon as well as to the public that the work was "flawless" and that BizJet had met its targets of "turn-time and client costs."

As a result of the misrepresentations, overcharges, delays, and the grossly negligent work performed by BizJet, Monsoon has suffered compensatory damages of at least **THREE MILLION DOLLARS ($3,000,000)**. Monsoon seeks the recovery of these compensatory damages as well as punitive damages due to BizJet's gross negligence and its misrepresentations, in an amount not less than an additional **THREE MILLION DOLLARS ($3,000,000)**.

Monsoon, upon information and belief, is not the only dissatisfied customer of BizJet. Contrary to what had been represented to Monsoon and others about the company's "leadership" role and "state of the art" services, the company has continued to deteriorate.

The CEO was replaced with another Lufthansa executive in July 2015. Then, in November 2015, BizJet cut 60 percent of its workforce. While Monsoon had been assured that it was contracting with an industry leader, in fact it had

contracted with a company that was trending downward and was willing to make whatever promises were necessary to secure new business.

## PARTIES, VENUE, & JURISDICTION

1.

Moon, Sun & Stars, Inc. is a Florida corporation with its principal place of business in Highland Beach, Florida.

2.

Moon, Sun & Stars, Inc. is the owner of a Gulfstream G450 Aircraft (the "Aircraft"), hangared in Boca Raton, Florida.

3.

Monsoon, Inc. is a Florida corporation with its principal place of business in Highland Beach, Florida. Monsoon, Inc., the parent company of Moon, Sun & Stars, Inc., is the entity responsible for paying and employing the individuals who work for Moon, Sun & Stars, Inc.

4.

In Florida, Monsoon accepted BizJet's proposal for the mid-life inspection of the Aircraft.

5.

BizJet is an Oklahoma corporation with its principal place of business in Tulsa, Oklahoma. BizJet has full time employees working in Florida.

6.

BizJet is part of the Lufthansa Technik Group of companies, which is owned directly or indirectly by Lufthansa Airlines.  BizJet services corporate jet engines, among other work.

7.

BizJet can be served through its registered agent, Crowe & Dunlevy, P.C., Attn: Michael J. Gibbens, 321 S. Boston, Suite 500, Tulsa, Oklahoma 74103.

8.

This Court has both specific and general personal jurisdiction over BizJet. BizJet regularly transacts business in the Southern District of Florida; the proposal at issue was negotiated and agreed to in the Southern District of Florida; BizJet maintains full-time employees in Florida; and BizJet has sufficient contacts with the Southern District of Florida to subject it to personal jurisdiction under the Florida long-arm statute.  The Aircraft was hangared in Boca Raton, Florida, and flown to and from Florida to BizJet's facilities in Oklahoma.  Plaintiffs' owner, Jackie Ward, is a resident of the State of Florida, residing in the Southern District. BizJet elected to provide services to Florida residents with respect to an Aircraft located in the Southern District.  The exercise of such jurisdiction is consistent with Florida law and with due process.  Fla. Stat. § 48.193(1)(a); *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 319 (1945).

9.

Pursuant to 28 U.S.C. § 1332(a), this Court has subject matter jurisdiction over this matter in that the requisite complete diversity exists among the parties, and the amount in controversy exceeds $75,000.

## FACTUAL BACKGROUND

### A.    The Parties and the Aircraft.

10.

Ms. Ward, the CEO of Monsoon, Inc. and Moon, Sun & Stars, Inc., is one of the leading and most successful female pioneers of entrepreneurship and corporate governance in the United States.  Ms. Ward founded Computer Generation Incorporated in 1968.  She has served on the boards of Bank of America Corp., Flowers Industries, Equifax, Inc., WellPoint, Inc., Matria Healthcare, Inc., Ptek Holdings, Inc., and PRG-Schultz International, Inc.  Presently, Ms. Ward is Chairman of the Board of Sysco Corp. and serves on the board of Sanmina-SCI Corp.

11.

Ms. Ward travels extensively for business.  In 2009, Monsoon purchased the Aircraft from its first owner in order to provide safe and reliable private transportation for Ms. Ward and those with whom she travels, including fellow directors of several large corporations.  Given Ms. Ward's extensive travel

schedule and the frequent passengers on the Aircraft, safety and reliability were paramount.

12.

As shown below, BizJet's actual services, in terms of cost, turn-around time, and results, did not live up to the company's promises, and did not meet, much less exceed, the client's expectations.  Monsoon's experience with BizJet was a disaster.

**B.** **BizJet Misrepresents its Capabilities to Obtain Monsoon's Business Contract**.

13.

Aircraft engines must be inspected at certain intervals during their lifetime. For the Tay series, Rolls-Royce requires what is known as a "mid-life inspection" when the engine has been in service for 10 years.

14.

A mid-life inspection involves disassembling each engine, inspecting the components and parts, replacing parts where necessary, re-assembling the engine, and placing the engine into a test cell to ensure that it is operating properly.  At that point, the engine is certified and placed back on the Aircraft.

15.

The Rolls-Royce Tay 611-8C engines, the newest engines in the "Tay" series, were used on the Gulfstream G450 jet series for the first time.

16.

In 2013, the first of the Tay 611-8Cs – including the two engines on Monsoon's Aircraft – reached the mid-life inspection stage.

17.

Monsoon's pilot, Brad Mears, has more than 20 years of aviation industry experience and approximately 6,000 flying hours.  Mr. Mears was in charge of the mid-life inspection for Monsoon, and sought to identify a company to perform the mid-life inspection which had the necessary expertise, training, and equipment.

18.

BizJet actively sought Monsoon's mid-life inspection.  BizJet's regional sales manager, Dustin Booth, and BizJet's regional director of international sales, Colin Poe, met with Mr. Mears in Southwest Ranches, Florida in 2013 to convince Monsoon to retain BizJet.

19.

BizJet's representatives, including Mr. Booth and others, repeatedly assured Mr. Mears that BizJet had the capability to perform the mid-life inspection on the Tay 611-8C engines.  BizJet assured Monsoon that it had the facilities, equipment, and expertise necessary to perform a high-quality and thorough mid-life inspection of Tay 611-8C engines.  Knowing that price and timeliness were critical factors as well, BizJet quoted a very attractive price and assured Monsoon that the work

could be completed within approximately 40 days.  The timeliness was very important for Monsoon in light of Ms. Ward's business schedule and that of her fellow Board members who would travel on the Aircraft.

20.

In March 2013, BizJet submitted a proposal to Monsoon for the mid-life inspection.

21.

The proposal assured Monsoon –falsely– that BizJet had a wealth of knowledge and experience on the Gulfstream G450 and its engines, and made numerous other false representations separate and apart from the contract.  These representations were repeated during the servicing, to induce Monsoon to continue using BizJet.

22.

BizJet estimated that the work would take 40 days.

23.

BizJet specified the costs of discrete components of the inspection:

- $175,000 per engine for the basic inspection work scope (labor, consumable kits, use of the test cell facility, and fuel);

- $3,500 per engine for engine mount inspection;

- $10,200 per engine for on-site removal and reinstallation;

- $5,425 per engine for off-site engine removal and reinstallation; and

- $14,000 per engine for shipping and delivery.

24.

Regarding replacement parts, BizJet represented that "a good estimate of possible parts fall out cost would be a low number of $10k, and the high mark being $170k per motor.  The average we would expect to be around $68k."  See Exhibit A.

25.

BizJet falsely represented that "no additional space or facilities were required as we planned for this many years ago. . . . We are coordinating with both Gulfstream and Rolls Royce for this training and are receiving favorable cooperation."  See Exhibit B.

26.

BizJet made these representations and assurances to Monsoon to get the inspection contract with Monsoon and tap into the growing market of Tay 611-8C engine owners that soon would need mid-life inspections performed.

27.

The potential market for mid-life inspections on these engines was enormous.  The potential revenue stream from these inspections was projected to exceed $100 million.  BizJet hoped that securing the first Tay 611-8C mid-life

inspection from Monsoon would put it in a prime position to corner the market.

28.

BizJet issued press releases announcing its Tay 611-8C engine inspection business, stating as follows: "[T]he timing is perfect for our marketing approach and launch into supporting the Tay 611-8C as the age of the fleet and demand is just beginning," and that it "chose to enter the market now due to the high number of engine inputs starting this year and increasing each year."  See Exhibits C and B.

29.

Monsoon, believing and relying on BizJet's representations, entrusted BizJet to inspect the two engines on its Aircraft.  Monsoon accepted BizJet's proposal in Florida on June 14, 2013.

30.

In the proposal BizJet made specific representations and warranties, including the following:  "BizJet represents and warrants that its workmanship conforms to the intent of the requirements of the manufacturer of the engine or components, and that the quality of such workmanship is in accordance with the applicable provisions of the Federal Aviation Regulations."  BizJet made numerous other representations in the proposal and thereafter, including as to capabilities, cost and turn-time, which were untrue.

**C.**   **BizJet Negligently Performed the Work, and Misrepresents the Nature and Results of the Work**.

31.

The mid-life inspection of the Aircraft began on September 12, 2013 at BizJet's Tulsa, Oklahoma facility.

32.

As of October 22, forty days into the project, BizJet had not yet reassembled or tested either of the Aircraft's engines, despite estimating in the proposal that all of the work for the mid-life inspection would be completed within 40 days.

33.

As of October 22, the inspection was already severely behind schedule.

34.

BizJet nevertheless issued a press release on October 22, falsely stating that it had "executed flawless removals and introduction of [the Aircraft's] engines…. We also maintained normal production targets regarding turn-time and client costs." See Exhibit D.

35.

BizJet failed to meet its projected completion deadline.  Contrary to BizJet's assurances that it was prepared for the mid-life inspection, it had to make a number of crucial upgrades before it could even begin the inspection.  BizJet knew that its representations to Monsoon regarding the completion date both before and after the

-12-

contract was signed, were false.

36.

For example, after Mr. Mears agreed to the proposal on behalf of Monsoon, Inc., BizJet ordered a crucial component, an adapter to be used in the test cell. BizJet ordered a "bolt-on" type adapter, instead of a "flange" type adapter.

37.

According to BizJet's engineers, the bolt-on adapter, as opposed to a "flange" type adaptor, needed to be used because the flanged adaptor was more susceptible to incorrect installation and failure.

38.

Nevertheless, when BizJet's supplier erroneously sent a bolt-on adapter designed for a classic Tay 611-8 engine instead of one designed for the Tay 611-8C, BizJet failed to demand that the manufacturer provide the component necessary to ensure engine safety.  Instead, BizJet borrowed a flanged type adapter from Rolls-Royce to use in the Aircraft inspection, despite knowing that the flanged adaptor was inadequate for the inspection.

39.

BizJet used the flanged adapter despite the objections of its own engineer. BizJet also neglected to make Monsoon aware of the engineer's concerns prior to the inductions of both engines.

40.

Internally, BizJet engineers continued to express doubts regarding the stability of the flanged adapter.

41.

The Aircraft's right engine completed its test cell certification without incident and was mounted on the Aircraft on November 12.

42.

The left engine was placed in the test cell on November 9, and it promptly failed the first testing.

43.

The left engine repeatedly failed testing in the BizJet test cell.

44.

On November 22, 2013, the left engine went into the test cell for the fourth time.  While in the test cell, the left engine underwent a catastrophic failure when the flanged adapter broke off of the engine, resulting in severe damage to the test cell equipment and to the engine.  See Exhibit E.

45.

Photographs of the broken adapter show that the adapter was not properly secured by BizJet.  BizJet's failure to perform such a relatively simple (and crucial) task was grossly negligent, particularly given that the engine had failed in

the test cell three previous times and that BizJet was on notice to be particularly careful with the flanged adapter.

46.

The November 22 incident rendered BizJet's test cell inoperable.  BizJet therefore sent the engine with serial number 85006 to Rolls-Royce in Montreal for certification in Rolls-Royce's test cell.

47.

On December 31, 2013, the Aircraft was returned to Monsoon and flown home to Boca Raton.

48.

In all, the mid-life inspection took 92 days—more than double what BizJet had estimated in the contract.  The Aircraft had been out of service for 113 days. Monsoon incurred additional expenses, including charter aircraft, as a result of BizJet's gross delays in completing the work.

49.

BizJet then charged Monsoon over $1.3 million—more than twice what BizJet "estimated" and far more than even BizJet's highest estimate.  BizJet intentionally underestimated the cost in order to secure Monsoon's business, with no intent to honor the estimate and no good faith belief the estimate was accurate.

-15-

**D.**   **BizJet's False and Misleading Statements to Plaintiffs and to the Public.**

50.

The importance of the mid-life inspection to BizJet's business plan is highlighted by its October 22, 2013 release.  BizJet trumpeted its "flawless" performance on Monsoon's Aircraft:

> BizJet International, Lufthansa Technik's hundred percent US subsidiary based in Tulsa, Oklahoma, has inducted its first Rolls-Royce Tay Mk611-8C engines into facility for maintenance.
>
> "We are well underway in achieving a significant services role with the induction of our first two Rolls-Royce Tay 611-8C Mid-life inspections and completing the first half of correlating our test cell for the -8C," says Criss Berry, Vice President Engine Services for BizJet.
>
> He added: **"Our team not only executed flawless removals and introduction of our launch customer's engines while satisfactorily completing our cell's performance and diagnostic tests for correlation, we also maintained normal production targets regarding turn-time and client costs. This is a remarkable validation of our teams planning and operational effectiveness."**

(Exhibit D (emphasis added).)   In light of what had really transpired as of the date of this press release, BizJet's statements were shocking.

51.

BizJet knew at the time that this characterization of the mid-life inspection on the Aircraft was false.  The work did not meet the targets for "turn-time and

-16-

client costs."  The work was hardly "flawless" and was by no means "satisfactory."

Yet, in its continuing efforts to obtain the mid-life business for the new engine,

BizJet publicly misrepresented its performance, just as it had misrepresented its

projected turn-time, costs and capabilities to Monson to induce Monsoon to go

with BizJet and continue with BizJet.

52.

BizJet maintained this press release on its website long after claims had been

asserted by Monsoon and its insurer, and long after it was advised by Gulfstream

and Rolls Royce of its grossly negligent performance.

53.

BizJet's false characterization of its performance to the public was

consistent with its position with Monsoon when Monsoon urged BizJet to

investigate and correct the obvious problems with the mid-life, *i.e.*, that any

deficiencies in the work were not its fault and did not need to be corrected.

E.   **Monsoon Discovered BizJet's Gross Negligence, But BizJet Refused to Perform under the Warranty**.

54.

BizJet's performance fell far short of what had been represented to

Monsoon.  The costs far exceed those represented to Monson, the turn-around time

was abysmal, and the work performance and facilities were less than promised.

-17-

55.

As of the time the Aircraft was ready to be flown in January 2014, BizJet had not performed as represented and had not complied with the contract.  Yet, Monsoon's nightmarish experience with BizJet was just beginning.

56.

On January 15, 2014, the Aircraft was taken on its first flight after the mid-life inspection.

57.

Immediately after the engine started, Ms. Ward and her husband both heard an abnormal guttural or a low-frequency roaring sound coming from the engines. The cabin noise was noticeably higher than it had been prior to the mid-life inspection.

58.

Once the Aircraft took off and reached cruising altitude, the engines went from full power to a nominal cruise power setting.  At this point, both Mr. Mears and the passengers began to notice strong vibrations in the cabin that had not existed before the mid-life inspection.  On further investigation, the vibrations appeared to emanate from the left engine.

59.

When the Aircraft returned to Boca Raton, Mr. Mears promptly sent a text message to Dustin Booth and Colin Poe, alerting them of the noise and vibration and asking them to come check the Aircraft.

60.

The following day, Mr. Mears demonstrated the noise levels to Mr. Booth by taxiing the Aircraft.  They did not fly in the Aircraft.  Mr. Booth took pictures of the gauges in the cockpit that registered information about the engines.  He sent these images to BizJet engineers.  Based on the minimal information conveyed by these gauges, BizJet advised Monsoon to continue to operate the Aircraft.  BizJet showed little regard for the safety of the pilot or passenger, or any concern regarding the performance of the engine.

61.

Concerned with BizJet's advice, Monsoon retained Gulfstream to conduct a cabin noise and engine vibration survey.  During the test flight, the Gulfstream engineer commented that the noise and vibration were significant enough to cause him to be uncomfortable flying his own family in the Aircraft.  This again caused Ms. Ward and Mr. Mears serious concern about their personal safety.

62.

Gulfstream identified a low frequency rumble and vibration emanating from the left engine and advised that the problem should receive immediate attention.

63.

In talking with Gulfstream engineers and observing Gulfstream's testing processes, Mr. Mears realized that BizJet did not use the proper equipment to detect vibration issues during the test flight, which occurred at the end of the mid-life inspection before the Aircraft was given back to Monsoon.

64.

The Tay 611-8C engine includes sophisticated sensors and systems that record real-time data about the status of the engine, including detailed information about engine vibrations.  The Gulfstream G450's cockpit interface uses some of this information to provide the pilot with minimal information about the engines during flight.

65.

However, the type of vibration issue that occurred on the Aircraft cannot be diagnosed based on the information on the cockpit interface.  As Mr. Mears learned from Gulfstream engineers, diagnosing such vibration issues during flight requires the use of sensitive vibration- and noise-detecting equipment installed throughout the cabin during taxi and flight.

-20-

66.

Before Mr. Mears signed the contract with BizJet for the mid-life inspection, BizJet had represented that Gulfstream engineers would be on-site to assist with certain portions of the inspection, including the final test flight before the Aircraft was returned to Monsoon.  Mr. Mears relied on this representation.

67.

However, BizJet did not retain Gulfstream to assist in the inspection or the test flight.

68.

On information and belief, instead of using the proper equipment, BizJet inspectors relied solely on the cockpit interface to detect any noise or vibration in the engines.  Because the interface was incapable of detecting the type of vibration that occurred in the Aircraft, the test flight was essentially a meaningless exercise.

69.

If BizJet had retained Gulfstream as they represented to Mr. Mears, and Gulfstream employees had been present for the test flight, they would have used the appropriate equipment to detect improper vibrations and noise levels in the cabin before the Aircraft was returned to Monsoon.  However, contrary to representations, BizJet did not have this equipment, and they did not obtain it for

use during the test flight of the Aircraft.  As a result, Monsoon received the Aircraft back in a dangerous and defective condition.

70.

After Gulfstream's inspection, Monsoon was forced to discontinue operation of the Aircraft for the safety of its passengers and crew—incurring expenses for alternative transportation in the interim.

71.

Ms. Ward personally contacted BizJet regarding the serious safety concerns with the Aircraft.  She notified BizJet that Monsoon had discontinued flying the Aircraft and expected BizJet to reimburse the company for substitute transportation.

72.

Ms. Ward met with the then-CEO of BizJet, Manfred Gaertner, and presented Gulfstream's findings.  BizJet summarily dismissed the reports from both Monsoon and Gulfstream.  He claimed that the Aircraft's vibration problems were caused by a fuel pump, even though Gulfstream engineers had specifically eliminated fuel pumps as the source of the vibration.  The meeting ended abruptly, after the CEO voiced hostility towards Ms. Ward, a customer that had paid BizJet nearly a million dollars for faulty work, and after he showed little sincere interest in standing behind the work or performing under the warranty.

73.

BizJet, without performing a new inspection of the Aircraft, falsely represented that "there are no safety or mechanical concerns . . . that would preclude further operation of the Aircraft," and that the vibrations on the Aircraft were less than they were before the mid-life inspection.

74.

BizJet's advice to continue flying the plane was not only in direct contravention of the data collected, but also was grossly negligent and in reckless disregard for Monsoon's passengers' and pilot's safety.

75.

BizJet proposed flying the Aircraft back to Tulsa to be re-tested.

76.

Monsoon requested that BizJet honor the contractual warranty and confirm that it would pay the expenses of the repairs to the Aircraft, without success.

77.

BizJet refused to examine all mechanical possibilities for the Aircraft's symptoms and to follow Gulfstream's recommendations for repair.  Instead, BizJet stated that there was no indication that the Aircraft was malfunctioning, and provided Monsoon a proposal to only re-do the tests it had already poorly performed.

78.

In three separate emails, BizJet expressly refused to honor the warranty, stating that it "will not be financially obligated in support of finding resolution." See Exhibit F. While BizJet's lawyers gave lip service to doing warranty work, BizJet had already gone into "cover-up" mode. Monsoon could not take a chance in entrusting its Aircraft to BizJet again.

79.

On March 21, 2014, Monsoon notified BizJet that its refusal was in breach of the contract and the warranty.

80.

Further, given BizJet's grossly negligent work and unfounded, intentionally false representation that the Aircraft was functioning normally in the face of directly contrary evidence, Monsoon had no faith that BizJet would perform the work with the requisite care.

81.

The warranties failed of their essential purpose. BizJet made it clear it would not accept responsibility for the work or spend the time and money necessary to complete the work properly. BizJet's CEO was more interested in denying there were any issues and in putting the blame elsewhere. Nor did BizJet have the capability to perform any warranty work properly.

**F.     Gulfstream Identified Grossly Negligent Work by BizJet**.

82.

Monsoon entrusted Gulfstream to do the first of the necessary repair work to address the cabin noise and vibration.

83.

Beginning on March 24, 2014, Gulfstream performed inspections consistent with the recommendations in its earlier report.  Rolls-Royce representatives were on hand for the inspections, and together the Rolls-Royce and Gulfstream engineers made recommendations to identify the source of and make necessary repairs to fix the vibration problems.

84.

During the inspection and repair processes, Gulfstream identified extensive damage to several of the left engine's LP fan blades, which in turn caused damage to the fan track liners.  See Exhibit G.

85.

At this point, Gulfstream removed the left engine from the Aircraft and replaced it with a rental engine so that Monsoon could continue to operate the Aircraft.  Upon removal of the left engine, Gulfstream discovered numerous, serious errors committed by BizJet during the mid-life inspection.

86.

Most importantly, during removal of left engine Gulfstream discovered that a BizJet employee had failed to properly torque an engine mounting bolt called the L/H forward Tapered Pin.  See Exhibit H.

87.

A BizJet inspector responsible for inspecting the engine mounting bolt installation failed to recognize the error.

88.

The loose bolt was the source of the noise in the cabin while the Aircraft was taxiing.

89.

Not only did BizJet's gross negligence in failing to properly tighten the bolt create the issues Monsoon complained of, but it also endangered the lives of the Aircraft's passengers.  Over time, as the Aircraft flew, the improperly torqued bolt could easily have loosened to a point where the engine mount could no longer hold the engine.  This would cause a host of problems, ranging from serious (*i.e.*, the engine shifting within the mount such that its thrust vector moves and interferes with the pilot's control of the Aircraft) to lethal (*i.e.*, the engine detaching from the Aircraft during flight).

90.

BizJet made additional errors evidencing the gross negligence with which it performed the mid-life inspection.  For example, BizJet, in creating its fan blade charts, incorrectly recorded the weights for each fan blade and failed to install the fan blades in their correct positions.  See Exhibit I.  The incorrectly installed fan blades created the vibrations felt in the cabin when the Aircraft was at cruising altitude.

91.

Each time BizJet reinstalled the blades in an improper manner, BizJet disassembled and reassembled the engine, which exposed the engine to additional errors and decreased the value of the Aircraft by unnecessarily extending its maintenance history.  BizJet never caught this glaring and readily identifiable mistake.

92.

BizJet's failure on such a fundamental point showed a strong lack of competency to perform the mid-life inspection, for which it claimed to have been preparing for years.

93.

Gulfstream also discovered additional examples of BizJet's utterly gross negligence and its disregard for its contractual obligations, its representations of

competency, and flight safety.  Particularly egregious examples include the following:

- BizJet left an engine mounting bolt un-torqued.

- BizJet damaged a crane beam during engine installation.

- BizJet damaged engine isolators during engine installation.

- BizJet improperly mounted an LP duct, causing damage to the duct.

- BizJet failed to torque thrust strut mounting bolts on both the forward and aft sections of the engine.  As a result, the strut was contacting the airframe and the strut was tearing.

**G.** **Rolls Royce Performed a Second Mid-life Inspection, and Discovered Yet More Egregious Gross Negligence by BizJet**.

94.

Following the Gulfstream work, and despite BizJet's claims to the contrary, it was now obvious that the left engine needed a full inspection and repair, which would essentially be a re-do of the mid-life inspection.

95.

Because of the extent of the damage to the left engine, Monsoon had trouble finding any company which would agree to take on the repairs.  Even Rolls-Royce at first refused to perform the repairs, apparently fearing liability in the event the engine became unfixable.  In the meantime, Mr. Mears was flying the Aircraft

-28-

using a leased engine.

96.

Finally, in October 2014, Rolls-Royce agreed to do the inspection and repair work.

97.

During the second mid-life inspection, Rolls-Royce discovered even more gross negligence by BizJet.  Rolls-Royce ultimately generated a report for Monsoon, which detailed the errors by BizJet, which were numerous and potentially deadly.

98.

For example, the Stage 12 outer vee clamps were not torqued.  Had these clamps released, which would have likely occurred within the 10 years between engine inspections, the most likely result would have been a midflight, uncontrolled engine fire.

99.

There were other examples of gross negligence.  In what could have been a catastrophic mistake, BizJet had failed to properly torque the bolts which hold the engine on the engine mount.  Though the procedure for torqueing the bolts is fairly simple, given its importance, two BizJet employees were required to sign off on the process.  Yet again, much like the failure to properly record data regarding the

LP fan blades and the failure to properly install the flanged adapter, both of the

BizJet employees failed to catch the mistake.  Flying the Aircraft in this condition

was dangerous, yet BizJet continued to insist the Aircraft was airworthy.

100.

Rotating parts of the engine, which have zero tolerance for any damage

caused by tools, were shown to have significant tool damage.  Based on this

damage, Monsoon and Rolls-Royce can only assume that BizJet had used inferior

tools for the mid-life inspection.

101.

The HPT2 disc, newly installed by BizJet in 2013, was misaligned and

drilled non-concentrically, creating a dangerous wobble in the engine.

102.

On December 23, 2014, Rolls-Royce completed the engine test, and the

Aircraft was placed back into flight in February 2015, 17 months after the Aircraft

had gone to BizJet for the mid-life inspection.

**H.** **The Aftermath:  Monsoon's Damages Unreimbursed by Insurance**.

103.

Due to BizJet's breaches of contract and grossly negligent and willful

misconduct, Monsoon incurred at least **$1,472,000** in unreimbursed expenses, in

addition to attorneys' fees and personnel time to handle the issue.  The charges

-30-

include (1) $919,927.10 paid to BizJet for the essentially worthless mid-life inspection; (2) approximately $26,000 in travel expenses incurred by Mr. Mears in overseeing the mid-life inspection and resulting repairs to the Aircraft; (3) approximately $13,000 in expenses for the contract pilot retained by Monsoon when flights regarding the repairs were necessary; (4) approximately $485,000 in other expenses including alternative travel arrangements for Ms. Ward and an expert borescope witness hired by Monsoon to oversee the December 2013 Roll-Royce certification; and (5) $28,354.24 in aircraft storage expenses.

104.

In addition, Monsoon's Aircraft has been diminished in value by at least **$1,500,000**.

## I.   BizJet's Refusal to Accept Responsibility.

105.

Monsoon, through its counsel, sent a series of demand letters to BizJet.  The final demand letter was dated December 16, 2015 and is attached (without voluminous attachments) as Exhibit J.  BizJet continued to deny responsibility, and failed to compensate Monsoon for its losses.

106.

Monsoon, upon information and belief, is not the only dissatisfied customer of BizJet.  Contrary to what had been represented to Monsoon and others about the

company's "leadership" role and "state of the art" services, the company has continued to deteriorate.

107.

The CEO was replaced with another Lufthansa executive in July 2015. Then, in November 2015, BizJet cut 60% of its workforce.  While Monsoon had been assured that it was contracting with an industry leader, in fact it had contracted with a company which was trending downward and was willing to make whatever promises were necessary to secure new business.

**COUNT ONE –
<u>BREACH OF CONTRACT</u>**

108.

Monsoon incorporates and reasserts the allegations in the above paragraphs as if fully set forth herein.

109.

The proposal of BizJet that Monsoon accepted expressly obligated BizJet to provide workmanship that conforms to the intent of the requirements of the manufacturer of the engines and that is of a quality that satisfies the applicable provisions of the Federal Aviation Regulations.

110.

BizJet failed to perform the mid-life inspection with workmanship that

-32-

conforms to the intent of the requirements of the manufacturer of the engines and that is of a quality that satisfies the applicable provisions of the Federal Aviation Regulations.

111.

BizJet failed to perform its contractual obligations necessary to fulfill the essential purpose of the contract, which was to appropriately investigate the mid-life status of the engines.

112.

BizJet, by performing grossly negligently under the contract, materially breached the contract with Monsoon, Inc.

113.

The mid-life inspection was riddled with defects of workmanship and ultimately caused serious damage to the engines.  BizJet's failure to perform the work in anything approaching a workman-like manner constitutes a material breach.

114.

Any limitations on liability in any of the contractual documents are void as unconscionable and public policy.  They are in any event inapplicable on their face when, by their terms, they do not apply in the case of gross negligence or willful misconduct.

115.

The warranties, as alleged above, failed of their essential purpose.  BizJet

did not have the capability of successfully repairing the engine.  Nor did Monsoon

have any confidence in BizJet's willing to do so, in light of the position of BizJet's

CEO at the time, the cover-up of past deficiencies, and the grossly negligent

performance of services to date.  Monsoon was unwilling to further risk the safety

of its owner and passengers.

116.

As a result of BizJet's breach of contract, Monsoon, Inc. was damaged in an

amount to be determined by a jury, but in any event no less than **THREE**

**MILLION DOLLARS ($3,000,000)**.

## COUNT TWO –
## <u>BREACH OF CONTRACTUAL EXPRESS WARRANTY</u>

117.

Monsoon incorporates and reasserts the allegations in the above paragraphs as if

fully set forth herein.

118.

In the contract between Monsoon, Inc. and BizJet, BizJet expressly

warranted that "engines, modules, and accessories overhauled and/or repaired by

BizJet are warranted to be free of defects in workmanship for a ten years [*sic*] from completion of the work by BizJet."

### 119.

BizJet failed to overhaul and/or repair the engines, modules, and accessories so as to render them free of defects in workmanship for ten years from completion of the work by BizJet.

### 120.

Monsoon, Inc. timely notified BizJet of the problems with the engines and asked that it repair them consistent with the express warranty.

### 121.

BizJet ultimately refused to stand by its warranty, claiming that there was no problem with the Aircraft and that it would not be responsible for any costs of repair.  BizJet also stated that it was only going to re-perform tests which it had already run, and which had failed to identify the problem with the left engine.

### 122.

Monsoon retained third parties to perform the necessary repairs.  Those third parties confirmed that there were serious, potentially life-threatening errors committed by BizJet.

### 123.

The warranty failed of its essential purpose, in light of BizJet's continuing

denial that any work was necessary, its failure to correct issues earlier, and its lack of capabilities, expertise, and equipment to handle any repairs.

124.

BizJet, by performing grossly substandard work and by refusing to correct that work upon Monsoon's demand, breached its contractual express warranty with Monsoon, Inc.

125.

As a result of BizJet's breach of contract, Monsoon, Inc. was damaged in an amount to be determined by a jury, but in any event no less than **THREE MILLION DOLLARS ($3,000,000)**.

## COUNT THREE –
## GROSS NEGLIGENCE

126.

Monsoon incorporates and reasserts the allegations in the above paragraphs as if fully set forth herein.

127.

BizJet undertook to perform the mid-life inspection on the Aircraft and had a duty to Monsoon to perform that work in a manner consistent with the industry customary standard of care.

128.

BizJet falsely or grossly negligently claimed it was ready and able to do mid-life inspections on the Tay 611-8C engine, specifically representing that it needed no additional space or facilities and that it had started planning for such inspections "many years ago."

129.

BizJet's actions and inactions in connection with inspecting the engines were performed grossly negligently.

130.

In particular:

- BizJet left an engine mounting bolt un-torqued.

- BizJet damaged a crane beam during engine installation.

- BizJet damaged engine isolators during engine installation.

- BizJet improperly mounted an LP duct, causing damage to the duct.

- BizJet failed to torque thrust strut mounting bolts on both the forward and aft sections of the engine.  As a result, the strut was contacting the airframe and the strut was tearing.

- Rotating parts of the Aircraft's engine, which have zero tolerance for any damage caused by tools, were shown to have significant tool damage.  Based on this damage, Monsoon and Rolls-Royce can only

assume that BizJet had used inferior tools for the mid-life inspection.

- The Stage 12 outer vee clamps were not torqued.  Had these clamps released, which would have likely occurred within the 10 years between engine inspections, the most likely result would have been a midflight, uncontrolled engine fire.

- The HPT2 disc was misaligned and mis-drilled non-concentrically, creating a dangerous wobble in the engine.

131.

Many of the errors made by BizJet were "double errors," meaning that multiple BizJet employees had to sign off on the work as being done correctly. Although the BizJet employees did so sign off, the errors were missed multiple times.

132.

For example, BizJet was grossly negligent in its weighing and placement of the LP fan blades.  The task was straightforward, and any error should have been easily caught by the multiple employees overseeing the task.  BizJet failed to catch the error.

133.

Upon notification from Monsoon that the work performed was causing obvious performance problems with the Aircraft, BizJet was grossly negligent in

advising Monsoon, without even a cursory examination of the Aircraft, that the Aircraft was safe to fly.

134.

The errors uncovered by Monsoon show that this was not the case. Had Monsoon not disbelieved BizJet, and undertaken a second mid-life inspection at its own cost, the Aircraft likely would have suffered a catastrophic loss in the ten years before its next scheduled inspection.

135.

BizJet's conduct was so reckless or wanting in care that it constitutes gross negligence at a minimum and a conscious disregard or indifference to the life, safety, or rights of persons exposed to such conduct.

136.

Particularly in this case, where an Aircraft was involved, BizJet's conduct threatened the lives of the Aircraft's passengers and crew.

137.

As a result of BizJet's gross negligence, Monsoon was damaged in an amount to be determined by a jury, but in any event no less than **THREE MILLION DOLLARS ($3,000,000)**.

## COUNT FOUR –
## INTENTIONAL MISREPRESENTATION / FRAUD

138.

Monsoon incorporates and reasserts the allegations in the above paragraphs as if fully set forth herein.

139.

BizJet intentionally misrepresented material information to Monsoon in an effort to convince Monsoon to contract with BizJet for the mid-life inspection of Monsoon's Tay 611 8-C engines, and thereafter to continue having the work performed by BizJet.

140.

Unfortunately, because the mid-life inspection has already been performed and Monsoon has already paid BizJet for the inspection, Monsoon is unable to rescind its acceptance of the proposal.

141.

BizJet intentionally misrepresented that it had a "wealth of knowledge and experience" that rendered it highly qualified to perform the mid-life inspection.

142.

BizJet intentionally misrepresented further that "no additional space or facilities were required [to perform the mid-life inspection] as we planned for this

-40-

many years ago."

143.

In reality, BizJet had to make crucial upgrades prior to the mid-life inspection.  Only after Monsoon signed the contract did BizJet secure crucial equipment, including ordering a "bolt-on" jet adapter necessary to test the engine.

144.

BizJet represented that it would retain Gulfstream to run the appropriate tests on the Aircraft following the mid-life inspection.

145.

In fact, BizJet failed to retain Gulfstream.  As a result, serious problems with the Aircraft were not discovered which should have been.  Monsoon ultimately retained Gulfstream, which immediately identified the issues.

146.

BizJet also provided false assurances as to cost and completion dates.  These and the foregoing representations were made before the proposal, in the proposal, and thereafter, in order to get Monsoon's business and to keep its business.

147.

After Monsoon agreed to use BizJet, during the mid-life inspection process, BizJet made additional intentionally false misrepresentations and intentionally withheld material information that it had a duty to reveal to Monsoon.

-41-

148.

For example, on or about the 40th day after the start of the mid-life inspection, BizJet issued a press release falsely stating it had "executed flawless removals and introduction of [the Aircraft's] engines….We also maintained normal production targets regarding turn-time and client costs," when, in reality BizJet was seriously behind schedule.

149.

In addition, BizJet internally continued to express doubts regarding its ability to perform the mid-life inspection adequately but never relayed this to Monsoon.

150.

BizJet's own engineer internally objected to using the adapter BizJet had chosen to perform the mid-life inspection.

151.

BizJet failed to inform Monsoon of its engineer's concerns regarding the adaptor BizJet ultimately used.

152.

BizJet made the additional intentionally false misrepresentations and intentionally withheld material information intending for Monsoon to rely on BizJet's misrepresentations and intentionally false non-disclosures and therefore

continue to allow BizJet to perform the mid-life inspection.

153.

BizJet made false inspection certifications, to create the appearance that each procedure was carefully performed and inspected.

154.

Monsoon indeed did rely, and thereby was without information necessary in order for it to make an informed decision whether to take the risks inherent with allowing BizJet to perform the mid-life inspection.

155.

Subsequent to the completion of the mid-life inspection, BizJet intentionally misrepresented crucial information to Monsoon and withheld crucial information from Monsoon, including information regarding the risks of flying the Aircraft.

156.

For example, BizJet told Monsoon that it should just keep flying the Aircraft, despite its knowledge of evidence indicating that the Aircraft's engines needed to be repaired, that it had used inferior tools in the mid-life inspection, and that outer vee clamps were not torqued, which could lead to uncontrolled engine fire.

157.

BizJet made the post-inspection misrepresentations and withheld crucial information intending Monsoon to rely upon those misrepresentations so that BizJet could avoid the expense of repairing the Aircraft, as it was contractually obligated to do.

158.

As a result of BizJet's misrepresentations, and Monsoon's reliance thereon to its detriment, Monsoon was damaged in an amount to be determined by a jury, but in any event no less than **THREE MILLION DOLLARS ($3,000,000)**.

## COUNT FIVE –
## <u>NEGLIGENT MISREPRESENTATION</u>

159.

Monsoon incorporates and reasserts the allegations in the above paragraphs as if fully set forth herein.

160.

BizJet's misrepresentations, as alleged above, were made intentionally or, at a minimum, grossly negligently.

161.

BizJet made the misrepresentations intending for Monsoon to rely on them.

162.

Monsoon indeed did rely to its detriment and thereby was damaged in an amount to be determined by a jury, but in any event no less than **THREE MILLION DOLLARS ($3,000,000)**.

## COUNT SIX –
## <u>PUNITIVE DAMAGES</u>

163.

Monsoon incorporates and reasserts the allegations in the above paragraphs as if fully set forth herein.

164.

As alleged above, BizJet committed gross negligence, willful misconduct, and fraud.  BizJet's conduct (and the conduct of BizJet's employees, including its CEO) was intentional and so reckless or wanting in care that it constitutes a conscious disregard or indifference to the life, safety, or rights of persons exposed to such conduct.

165.

Alternatively, BizJet intentionally or grossly negligently actively participated in and ratified the conduct of its employees, and refused to correct the work it knew was grossly deficient.  BizJet's CEO even advised Monsoon to

continue flying the Aircraft, despite evidence of serious problems caused by BizJet's work.

166.

BizJet should pay to Monsoon punitive damages in an amount to be determined by a jury, but in any event no less than **THREE MILLION DOLLARS ($3,000,000)**.

### **Jury Demand**

Monsoon demands a trial by jury on all triable issues.

WHEREFORE, Monsoon respectfully requests that the Court:

(a)     Enter judgment in favor of Monsoon and against Defendants in an amount not less than $3,000,000;

(b)      Award Monsoon punitive damages in an amount not less than $3,000,000;

(c)     Award Monsoon its attorneys' fees and expenses;

(d)     Grant such other and further relief as is just, proper and equitable.

This 6th day of May, 2016

/s/ *Jason S. Alloy*
Richard L. Robbins
Florida Bar No. 0651680
Jason S. Alloy
Florida Bar No. 0040559

Robbins Ross Alloy Belinfante
    Littlefield LLC
999 Peachtree Street, N.E.
Suite 1120
Atlanta, Georgia  30309
Telephone:    (678) 701-9381
Facsimile:    (404) 856-3250

*Attorneys for Plaintiffs*