UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 16-80722-CIV-MARRA/MATTHEWMAN

MONSOON, INC., and
MOON, SUN & STARS, INC.,

       Plaintiffs,

vs.

BIZJET INTERNATIONAL
SALES & SUPPORT, INC.,

       Defendant.

_____/

### ORDER AND OPINION ON MOTION TO DISMISS

**THIS MATTER** is before the Court upon Defendant's Motion to Dismiss, Motion for More Definite Statement, and Motion to Strike [DE 12]. The motion is fully briefed and ripe for review. The Court has carefully considered all relevant filings, entire Court file, and is otherwise fully advised in the premises.

**Facts as Alleged**[1]

Ms. Ward, the CEO of Monsoon, Inc. and Moon, Sun & Stars, Inc. ("Plaintiffs"), is one of the leading and most successful female pioneers of entrepreneurship and corporate governance in the United States. She has served on the boards of multiple large corporations, currently serves on the board of Sanmina-SCI Corp., and is

---

[1] In accordance with established law, the Court accepts all of Plaintiffs' allegations as true in determining whether they have stated claims for which relief could be granted. *Hishon v. King & Spalding,* 467 U.S. 69, 73 (1984). Furthermore, in light of the detailed nature of the instant motion to dismiss, the Court finds the extensive reiterations of the Complaint necessary.

chairman of the Board of Sysco Corporation.  Compl. ¶ 10.

Ms. Ward travels extensively for business.  In 2009, Monsoon purchased a Gulfstream G450 airplane (the "Aircraft") from its first owner in order to provide safe and reliable private transportation for Ms. Ward and those with whom she travels, including fellow directors of several large corporations.  Compl. ¶ 11.

Aircraft engines must be inspected at certain intervals during their lifetime. For the Aircraft's Rolls-Royce Tay 611-8C engines, Rolls-Royce requires what is known as a "mid-life inspection" when the engine has been in service for 10 years.  Compl. ¶ 13.  In 2013, the two engines on Plaintiffs' Aircraft were one of the first, if not the first, Tay 611-8C engines to reach the 10-year mark.  Compl. ¶ 16.  A mid-life inspection involves disassembling each engine, inspecting the components and parts, replacing parts where necessary, reassembling the engine, and placing the engine into a test cell to ensure that it is operating properly.  At that point, the engine is certified and placed back on the aircraft.  Compl. ¶ 14.

BizJet International Sales & Support, Inc. ("Defendant") actively sought to perform the Aircraft's mid-life inspection.  Compl. ¶ 18.  The potential market for mid-life inspections on these engines was enormous.  The potential revenue stream from these inspections was projected to exceed $100 million.  Defendant hoped that securing the first Tay 611-8C mid-life inspection from Plaintiffs would put it in a prime position to corner the market.  Compl. ¶ 27.  Defendant issued press releases announcing its Tay 611-8C engine inspection business, stating, "the timing is perfect

for our marketing approach and launch into supporting the Tay 611-8C as the age of the fleet and demand is just beginning," and that it "chose to enter the market now due to the high number of engine inputs starting this year and increasing each year." Compl. Exhibits C and D.

Defendant's representatives repeatedly assured Plaintiffs that it had the capability to perform the mid-life inspection on the Tay 611-8C engines.  Defendant assured Plaintiffs that it had the facilities, equipment, and expertise necessary to perform a high-quality and thorough mid-life inspection.  Knowing that price and timeliness were critical factors as well, Defendant quoted a very attractive price and assured Plaintiffs that the work could be completed within approximately 40 days. The timeliness was very important for Plaintiffs in light of Ms. Ward's business schedule and that of her fellow board members who would travel on the Aircraft. Compl. ¶ 19.

Plaintiffs, believing and relying on Defendant's representations, entrusted Defendant to inspect the two engines on its Aircraft.  Plaintiffs accepted Defendant's proposal in Florida on June 14, 2013.  Compl. ¶ 29.

Defendant failed to meet its projected completion deadline.  Nevertheless, Defendant issued a press release on October 22, 2013, falsely stating that it had "executed flawless removals and introduction of [the Aircraft's] engines. . .  We also maintained normal production targets regarding turn-time and client costs."  Compl. ¶¶ 34-35, Ex. D.  In fact, as of October 22, forty days into the project, Defendant had

not yet reassembled or tested either of the Aircraft's engines.  Compl. ¶ 32.  Contrary

to Defendant's assurances that it was prepared for the mid-life inspection, it had to

make a number of crucial upgrades before it could even begin the inspection.

Defendant knew that its representations to Plaintiffs regarding the completion date

were false, both before and after the contract was signed.  Compl. ¶ 35.

In addition, Defendant used a type of adapter, a crucial component to be used

in the test cell, that was inadequate for the inspection, despite knowing that it was

inadequate, and over the objections of its own engineer.  Compl. ¶¶ 38-39.

The Aircraft's right engine completed its test cell certification without

incident and was mounted on the Aircraft on November 12.  The left engine,

however, failed testing three times.  On November 22nd, during the fourth test, the

left engine underwent a catastrophic failure when the inadequate adapter broke off

the engine, resulting in severe damage to the test cell equipment and to the engine.

Compl. ¶¶ 41-44, Ex. E.

Photographs of the broken adapter show that the adapter was not properly

secured by Defendant.  Defendant's failure to perform such a relatively simple (and

crucial) task was grossly negligent, particularly given that the engine had failed in the

test cell three previous times and that Defendant was on notice to be particularly

careful with the inadequate adapter.  Compl. ¶ 45.

The November 22nd incident rendered Defendant's test cell inoperable.

Defendant then sent the engine to Rolls-Royce in Montreal for certification in Rolls-

Royce's test cell.  Compl. ¶ 46.  On December 31, 2013, the Aircraft was returned to Boca Raton.  Compl. ¶ 47.  In all, the mid-life inspection took 92 days - more than double what Defendant had estimated in the contract.  The Aircraft had been out of service for 113 days.  Plaintiffs incurred additional expenses, including charter aircraft, as a result of Defendant's gross delays in completing the work.  Compl. ¶ 48.

Defendant then charged Plaintiffs over $1.3 million - more than twice what Defendant estimated and far more than Defendant's highest estimate.  Defendant intentionally underestimated the cost in order to secure Plaintiffs' business, with no intent to honor the estimate and no good faith belief the estimate was accurate.

On January 15, 2014, the Aircraft was taken on its first flight after the mid-life inspection.  During the flight, the cabin noise was noticeably higher than it had been prior to the mid-life inspection, and strong vibrations were felt in the cabin that had not existed before.  On further investigation, the vibrations appeared to emanate from the left engine.  Compl. ¶ 56-58.

When Defendant was alerted of these developments, Defendant's representatives did not fly in the Aircraft, but merely took pictures of the gauges in the cockpit that registered information about the engines.  Based on the minimal information conveyed by these gauges, Defendant advised Plaintiffs to continue to operate the Aircraft.

Concerned with Defendant's advice, Plaintiffs retained Gulfstream to conduct a cabin noise and engine vibration survey.  During the test flight, the Gulfstream

engineer commented that the nosie and vibration were significant enough to cause him to be uncomfortable flying his own family in the Aircraft.  Compl. ¶ 61. Gulfstream identified a low frequency rumble and vibration emanating from the left engine and advised that the problem should receive immediate attention.  Compl. ¶ 62.  It became evident that Defendant did not use the proper equipment to detect vibration issues during the test flight, which occurred at the end of the mid-life inspection before the Aircraft was returned to Plaintiffs.  Compl. ¶¶ 63-65.

Before Plaintiffs signed the contract with Defendant for the mid-life inspection, Defendant represented that Gulfstream engineers would be on-site to assist with certain portions of the inspection, including the final test flight before the Aircraft was returned to Plaintiffs.  Plaintiffs relied on this representation.  However, Defendant did not retain Gulfstream to assist in the inspection or the test flight. Compl. ¶¶ 66-67.  If Defendant had retained Gulfstream as they represented, and Gulfstream employees had been present for the test flight, they would have used the appropriate equipment to detect improper vibrations and noise levels in the cabin before the Aircraft was returned to Plaintiffs.  However, contrary to representations, Defendant did not have this equipment, and they did not obtain it for use during the test flight of the Aircraft.  As a result, Plaintiffs received the Aircraft back in a defective and dangerous condition.  Compl. ¶ 69.

After Gulfstream's inspection, Plaintiffs were forced to discontinue operation of the Aircraft for the safety of its passengers and crew, incurring expenses for

alternative transportation in the interim.  Compl. ¶ 71.  Defendant summarily

dismissed the reports from both Plaintiffs and Gulfstream.  Compl. ¶ 72.  Defendant's

advice to continue flying the plane was not only in direct contravention of the data

collected, but also was grossly negligent and in reckless disregard for Plaintiffs'

passengers' and pilot's safety.  Compl. ¶ 74.

Defendant proposed flying the Aircraft back to their headquarters to be

retested.  Compl. ¶ 75.  Defendant refused to examine all mechanical possibilities for

the Aircraft's symptoms and to follow Gulfstream's recommendations for repair.

Instead, Defendant stated that there was no indication that the Aircraft was

malfunctioning, and provided Plaintiffs a proposal to only re-do the tests it had

already performed poorly.  Compl. ¶ 77.

Defendant made it clear it would not accept responsibility for the work or

spend the time and money necessary to complete the work properly.  Defendant's

CEO was more interested in denying there were any issues and in putting the blame

elsewhere.  Nor did Defendant have the capability to perform any warranty work

properly.  Compl. ¶ 81.

Plaintiffs entrusted Gulfstream to do the first of the necessary repair work to

address the cabin noise and vibration.  Compl. ¶ 82.  Beginning on March 24, 2014,

Gulfstream performed inspections consistent with the recommendations in its earlier

report.  During the inspection and repair processes, Gulfstream identified extensive

damage to several of the left engine's LP fan blades, which in turn caused damage to

the fan track liners.  Compl. ¶¶ 83-84, Ex. G.  At this point, Gulfstream removed the left engine from the Aircraft and replaced it with a rental engine so that Plaintiffs could continue to operate the Aircraft.

Upon removal of the left engine, Gulfstream discovered numerous, serious errors committed by Defendant during the mid-life inspection.  Compl. ¶ 85.  During removal, Gulfstream discovered that an employee of Defendant had failed properly to torque an engine mounting bolt, and Defendant's inspector responsible for inspecting the engine mounting bolt installation failed to recognize the error.  Compl. ¶¶ 86-87, Ex. H.  The loose bolt was the source of the noise in the cabin, and endangered the lives of the Aircraft's passengers.  Compl. ¶¶ 88-89.

Defendant made additional errors evidencing gross negligence with which it performed the mid-life inspection, and decreased the value of the Aircraft by unnecessarily extending its maintenance history.  Compl. ¶¶ 90-91.  For example, Defendant, in creating its fan blade charts, incorrectly recorded the weights for each fan blade and failed to install the fan blades in their correct positions.  Compl. ¶ 90, Ex. I.  Defendant's failure on such a fundamental point showed a strong lack of competency to perform the mid-life inspection, for which it claimed to have been preparing for years.  Compl. ¶ 92.

Gulfstream also discovered additional examples of Defendant's gross negligence, and its disregard for its contractual obligations, representations of competency, and flight safety.  Particularly egregious examples include the following:

- Defendant left an engine mounting bolt un-torqued.

- Defendant damaged a crane beam during engine installation.

- Defendant damaged engine isolators during engine installation.

- Defendant improperly mounted an LP duct, causing damage to the duct.

- Defendant failed to torque thrust strut mounting bolts on both the forward and aft sections of the engine.  As a result, the strut was contacting the airframe and the strut was tearing.

Compl. ¶ 93.

Following Gulfstream's work, and despite Defendant's claims to the contrary, it was now obvious that the left engine needed a full inspection and repair, which would essentially be a re-do of the mid-life inspection.  Compl. ¶ 94.  After first refusing to perform the repairs, Rolls-Royce finally agreed to do the inspection and repair in October, 2014.  Compl. ¶¶ 95-96.

During the second mid-life inspection, Rolls-Royce discovered even more gross negligence by Defendant.  Rolls-Royce ultimately generated a report for Plaintiffs, which detailed the errors by Defendant, which were numerous and potentially deadly.  Compl. ¶ 97-101.  On December 23, 2014, Rolls-Royce completed the engine test, and the Aircraft was placed back into flight in February 2015 - 17 months after the Aircraft had gone to Defendant for the mid-life inspection.

Due to Defendant's breaches of contract and grossly negligent and willful misconduct, Plaintiffs incurred at least $1,472,000 in unreimbursed expenses, in addition to attorneys' fees and personnel time to handle the issue.  Compl. ¶ 104.  In

addition, the Aircraft has been diminished in value by at least $1,500,000.  Compl. ¶

104.  Defendant has denied any responsibility and refuses to compensate Plaintiffs for

its losses.  Compl. ¶ 105.  Defendant failed to perform its contractual obligations

necessary to fulfill the essential purpose of the contract, which was to investigate the

mid-life status of the engines appropriately.  Compl. ¶ 111.

The Complaint consists of 166 paragraphs asserting six counts: Breach of

Contract (Count I), Breach of Contractual Express Warranty (Count 2), Gross

Negligence (Count 3), Intentional Misrepresentation/Fraud (Count 4), Negligent

Misrepresentation (Count 5), and Punitive Damages (Count 6).  Defendant moves to

dismiss all counts, or alternatively a more definite statement as to Count Four and

Count Five.  Defendant also asks the Court to strike the narrative preface and

allegations pertaining to Defendant's business generally, as immaterial, impertinent,

and scandalous, and to strike Plaintiffs' prayer for attorneys' fees based on the

absence of any statutory or contractual basis for them.  DE 12.

**Legal Standard**

With respect to a motion to dismiss for failure to state a claim pursuant to Rule

12(b)(6), the Court observes first that Rule 8(a)(2) of the Federal Rules of Civil

Procedure requires that a pleading contain a "short and plain statement of the claim

showing that the pleader is entitled to relief."  The Supreme Court has held that

"[w]hile a complaint attacked by a 12(b)(6) motion to dismiss does not need detailed

factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement

to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.  Factual allegations must be enough to raise a right to relief above a speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations omitted).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quotations and citations omitted).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id*.  Thus, "only a complaint that states a plausible claim for relief survives a motion to dismiss."  *Id*. at 1950.  When considering a motion to dismiss, the Court must accept all of the plaintiff's allegations as true in determining whether a plaintiff has stated a claim for which relief could be granted.  *Hishon v. King & Spalding,* 467 U.S. 69, 73 (1984).

In this case, Plaintiffs do not attach the contract at issue, but Defendant attaches it to their reply.  As a general rule, the Court must "limit[] its consideration to the pleadings and exhibits attached thereto" when deciding a Rule 12(b)(6) motion to dismiss.  *Grossman v. Nationsbank, N.A.*, 225 F.3d 1228, 1231 (11th Cir. 2000) (internal quotation marks and citation omitted).  Fed. R. Civ. P. 12(d) mandates that if matters outside the pleadings are presented to the court and not excluded, the motion must be treated as one for summary judgment under Rule 56.

In *Horsley v. Feldt*, 304 F.3d 1125, 1134 (11th Cir. 2002), the Eleventh Circuit held that the court may consider a document attached to a motion to dismiss without converting the motion into one for summary judgment if the attached document is (1) central to the plaintiff's claim, and (2) undisputed.  In this context, "undisputed" means that the authenticity of the document is not challenged.  *Id*.  These two elements are present in this case.  The contract is central to Plaintiff's claims because the Complaint arises out of the allegation that Defendant failed to properly perform the mid-life inspection as contracted.  Furthermore, the authenticity of the document has not been challenged by Plaintiffs.  The Eleventh Circuit's prior decisions also make clear that a document need not be physically attached to a pleading to be incorporated by reference into it; if the document's contents are alleged in a complaint and no party questions those contents, this Court may consider such a document, provided it meets the centrality requirement.  *Day v. Taylor*, 400 F.3d 1272, 1276 (11th Cir. 2005); *Harris v. Ivax Corp.*, 182 F.3d 799, 802 n.2 (11th Cir. 1999).  Accordingly, this Court may consider the contract, as necessary, to resolve the instant motion.

**Discussion**

**Counts One and Two**

Defendant argues that Counts One and Two must be dismissed because the Complaint fails to attach the contract or warranty, fails to plead with any degree of specificity the terms and conditions of the contract and warranty, and fails to allege

the exact contractual provisions which Defendant has breached.

As far as Plaintiffs' failure to attach the contract, that issue has been resolved by Defendant itself.  And as just discussed, the Court may consider the contract as it is central to Plaintiffs' claims and its authenticity is not disputed.

As for not pleading the terms and conditions of the contract and warranty  with any degree of specificity, the Court concludes Plaintiffs have met the requisite standard.  A breach of contract claim requires (1) a contract; (2) a breach thereof; and (3) damages.  *Formula LLC v. RSUI Indem. Co.*, 2009 WL 2342455, at *3 (S.D. Fla. 2009) citing *Friedman v. New York Life Insurance Co.*, 985 So.2d 56, 58 (Fla. Dist. Ct. App. 2008); *Profilet v. Cambridge Financial Corp.*, 231 B.R. 373, 382 (S.D. Fla. 1999). The Complaint provides the date of the agreement (Compl. ¶ 29) and explicit detail of pertinent provisions at issue (often with quoted language).  *See, e.g.*, Compl. ¶ 22 (time line for performance), ¶ 23 (estimated cost), ¶¶ 30, 109 (representations and warranties), ¶ 115 (essential purpose).  The Complaint is likewise full of references to the contractual provisions breached by Defendant and how those breaches led to the failure of the agreement's essential purpose:

- BizJet failed to perform the mid-life inspection with workmanship that conforms to the intent of the requirements of the manufacturer of the engines and that is of a quality that satisfies the applicable provisions of the Federal Aviation Regulations as represented in the contract. (Compl. at ¶ 110; see also Compl. at ¶ 30.)

- BizJet's mid-life inspection was riddled with defects of workmanship and ultimately caused serious damage to the engines. (Compl. at ¶ 113.)

- BizJet failed to overhaul and/or repair the engines, modules and accessories so as to render them free of defects in workmanship for ten years from the date of completion of the work. (Compl. at ¶ 119.)

- BizJet refused to stand by its warranty and refused to pay for any costs to repair the engine. (Compl. at ¶ 121.)

The Complaint explains in adequate detail the nature of the contract's terms or provisions which were allegedly breached.

"Perhaps most importantly for the purposes of this Motion to Dismiss," argues Defendant, is that Plaintiffs' fail to cite to any contract provisions which Defendant breached which caused the contract to fail of its essential purpose.[2]  DE 12 at 7.  The Court rejects this contention.  For instance, in paragraph 81, Plaintiff asserts,

the warranties failed of their essential purpose.  BizJet made it clear it would not accept responsibility for the work or spend the time and

---

[2]  There appears to be no dispute that the essential purpose of the contract was to complete the mid-life inspection of the engines with the degree of workmanship that complied with the engine's manufacturer's requirements and applicable provisions of the Federal Aviation Regulations.  Where circumstances cause a limited remedy to fail of its essential purpose, alternative UCC remedies may be available.  Fla. Stat. § 672.719; *Typographical Service, Inc. v. Itek Corp.*, 721 F.2d 1317, 1321 (11th Cir. 1983) (a repair-or-replace warranty fails of its essential purpose if the warrantor does not successfully repair defects within a reasonable time or within a reasonable number of attempts); *David v. American Suzuki Motor Corp.*, 629 F. Supp. 2d 1309, 1319 (S.D. Fla. 2009); *Griffis v. Leisure Tyme RV, Inc.*, 884 So.2d 241, 243 (Fla. Dist. Ct. App. 2004); *Pinellas Suncoast Transit Authority v. Mincom, Inc.*, 2007 WL 1222595, *3-4 (M.D. Fla. 2007) (holding that Fla. Stat. § 672.316 and § 672.719 stand for the principle that parties to a contract may properly limit the remedies for a breach-of-warranty to repair and replacement when such limitations are reasonable, but noting that the limitation is not valid when the limitation causes the product to fail of its essential purpose).

money necessary to complete the work properly.  BizJet's CEO was more
interested in denying there were any issues and in putting the blame
elsewhere.  Nor did BizJet have the capability to perform any warranty
work properly.

In paragraph 115, it is alleged,

The warranties, as alleged above, failed of their essential purpose.
BizJet did not have the capability of successfully repairing the engine.
Nor did Monsoon have any confidence in BizJet's willing[ness] to do so,
in light of the position of BizJet's CEO at the time, the cover-up of past
deficiencies, and the grossly negligent performance of services to date.
Monsoon was unwilling to further risk the safety of its owner and
passengers.

In paragraph 123, it is alleged,

The warranty failed of its essential purpose, in light of BizJet's
continuing denial that any work was necessary, its failure to correct
issues earlier, and its lack of capabilities, expertise, and equipment to
handle any repairs.

DE 1.

It may be said that the "essential purpose" of a contract is unfulfilled when

repeated unsuccessful efforts to repair a product has completely failed in its

intended purpose.  *See Parsons v. Motor Homes of America, Inc.*, 465 So.2d 1285,

1292 (Fla. Dist. Ct. App. 1985).  The Complaint alleges clearly that Defendant failed

to satisfy the essential purpose of the contract by performing defective workmanship

and ultimately, seriously damaging the engines.

In sum, the Motion to Dismiss based on Plaintiff's failure to attach the

contract, based on the argument that the contract is not plead with adequate

specificity, and based on Plaintiffs' failure to cite to any contract provisions which

Defendant breached which caused the contract to fail of its essential purpose, is denied.

## Counts Three through Six

Defendant next argues that Plaintiffs' tort claims alleged in Counts Three through Six are barred because the alleged torts are not in any way independent of or separate from the alleged breach of contract and breach of warranty claims. Defendant asserts that these tort claims all complain about the same thing: that Defendant failed to perform its obligations under the contract.

## Count Three:  Gross Negligence

*Economic Loss Doctrine*

Defendant asserts that Plaintiffs' gross negligence claim is simply a contract claim "dressed up" as a tort action.  "More specifically, Plaintiffs allege that BizJet undertook to perform the mid-life inspection, was grossly negligent in claiming it was ready to perform such work, was grossly negligent in actually performing the inspection, and was grossly negligent in advising Plaintiffs with respect to alleged complaints about the performance of the engine."  DE 12 at 11.

Plaintiff counters that the economic loss rule only applies in product liability cases, but even if it does apply here, it fails because Defendant agreed it could be sued for gross negligence.

In *Tiara Condominium Association, Inc. v. Marsh & McLennan Cos., Inc.*, 110 So.3d 399 (Fla. 2013) ("*Tiara*"), the Florida Supreme Court explained, "the economic

loss rule is a judicially created doctrine that sets forth the circumstances under which a tort action is prohibited if the only damages suffered are economic losses." *Id*. at 401 (citation omitted). *Tiara* clarified that the economic-loss rule applies only to cases involving products liability. *Tiara*, 110 So.3d at 407. Nonetheless, it is still possible to set forth a claim in tort between parties in contractual privity if a tort is alleged that is beyond and independent of the breach of contract claim. *See Tiara*, 110 So.3d at 408 (Pariente, J., concurring) (quoting *Elec. Sec. Sys. Corp. v. S. Bell Tel. & Tel. Co.*, 482 So.2d 518, 519 (Fla. Dist. Ct. App. 1986)). As Justice Pariente explained in her concurrence in *Tiara*,

> Our decision is neither a monumental upsetting of Florida law nor an expansion of tort law at the expense of contract principles. To the contrary, the majority merely clarifies that the economic loss rule was always intended to apply only to products liability cases....
>
> The majority's conclusion that the economic loss rule is limited to the products liability context does not undermine Florida's contract law or provide for an expansion in viable tort claims. Basic common law principles already restrict the remedies available to parties who have specifically negotiated for those remedies, and ... our clarification of the economic loss rule's applicability does nothing to alter these common law concepts. For example, in order to bring a valid tort claim, a party still must demonstrate that all of the required elements for the cause of action are satisfied, including that the tort is independent of any breach of contract claim ....

*Tiara*, 110 So.3d at 408–09 (Pariente, J., concurring); *see also Kaye v. Ingenio, Filiale De Loto-Quebec, Inc.*, 2014 WL 2215770, at *4 (S.D. Fla. 2014).

In the wake of *Tiara*, the Eleventh Circuit noted that "[w]hile the exact contours of this possible separate limitation, as applied post-*Tiara*, are still unclear,

the standard appears to be that 'where a breach of contract is combined with some other conduct amounting to an independent tort, the breach can be considered negligence.'"• *Lamm v. State St. Bank & Trust,* 749 F.3d 938, 947 (11th Cir. 2014) (quoting *U.S. Fire Ins. Co. v. ADT Sec. Servs., Inc.,* 134 So. 3d 477, 480 (Fla. Dist Ct. App. 2013)).

Courts in this District have continually followed the interpretation of *Tiara* suggested by the Eleventh Circuit in *Lamm.  See, e.g., Burdick v. Bank of Am., N.A.,* 99 F. Supp. 2d 1372, 1378 ("[T]he alleged duty [element of a negligence claim] cannot stem from a contractual relationship between the parties.... To bring a negligence claim under Florida law, a party must demonstrate that 'the tort is independent of any breach of contract claim.'"•(quoting *Tiara*, 110 So. 3d at 408 (Pariente, J., concurring)); *Kaye v. Ingenio, Filale de Loto-Que., Inc.*, No. 13-61687, 2014 WL 2215770, at *4 (S.D. Fla. May 29, 2014) ("to set forth a claim in tort between parties in contractual privity, a party must allege action beyond and independent of breach of contract that amounts to an independent tort"); *Altenel, Inc. v. Millennium Partners, L.L.C.*, 947 F. Supp. 2d 1357, 1369 (S.D. Fla. 2013); *Callaway Marine Technologies, Inc. v. Tetra Tech, Inc.*, 2016 WL 7407769, at *3 (S.D. Fla. 2016).

 "Generally, an action in tort arising out of a breach of contract by a defendant involves a separate and distinct duty imposed by law for the benefit of the plaintiff and allows the plaintiff to maintain an action without regard to whether a contractual relationship exist[s] between the two." *Southern Wind Aviation, LLC v.*

*Cessna Aircraft Company*, 2014 WL 12570958, at *5 (M.D. Fla. 2014) citing *Miller v. Allstate Ins. Co.*, 573 So. 2d 24, 27 (Fla. Dist. Ct. App. 1990).  A review of the paragraphs in Count Three of the Complaint does not show any independent duties not imposed by the contract.  Indeed, Count Three is entirely about Defendant's actions or inactions taken with respect to the mid-life inspection of the Aircraft and how those actions and inactions were performed in a grossly negligent fashion.  Compl. ¶¶ 126- 129.  Accordingly, Count Three is barred by the economic loss rule.  *Court Appointed Receiver of Lancer Offshore, Inc. v. Citco Group Ltd.*, 2008 WL 926513, at *3 (S.D. Fla. 2008).

*Defendant Agreed to be Sued for Gross Negligence?*

Plaintiffs argue that they should be entitled to bring a claim for gross negligence because Defendant "agreed in the contract at issue that the limitation on liability provision under the contract does not apply to claims of gross negligence or willful misconduct." [DE 1 at ¶ 114].  More specifically, Plaintiffs' Response Brief states that "[t]o hold that Monsoon is nevertheless barred from bringing a gross negligence claim because it is duplicative of its contract claims, despite gross negligence being excluded from the contract, would lead to an absurd result."  DE 13 at 10.

The operative language states in pertinent part as follows:

SERVICE CENTER'S TOTAL LIABILITY ON ANY AND ALL CLAIMS, OF ANY NATURE (INCLUDING NEGLIGENCE BUT EXCLUDING GROSS NEGLIGENCE OR WILLFUL MISCONDUCT), ARISING FROM, CONNECTED WITH, OR

> RESULTING FROM, PERFORMANCE OR BREACH OF THIS AGREEMENT SHALL
> NOT EXCEED SERVICE CENTER'S INVOICE FOR THE ITEM OR WORK GIVING
> RISE TO SUCH CLAIM.

Contract, DE 14-1 (Ex. A) at 6.

This clause limits Defendant's liability to the amounts invoiced to Plaintiffs for "the item or work giving rise to such claim" unless Defendant performs under the contract in a grossly negligent fashion, or engages in willful misconduct.  The provision confirms that if Plaintiffs prove that Defendant's performance under the contract was grossly negligent, then the specific limitation of liability in this passage does not apply.  It is silent as to whether such a claim sounds in contract or tort.  However, it appears Plaintiffs contemplated that its claim for breach of contract would include alleged breaches resulting from grossly negligent performance, because their Complaint so alleges. ("Bizjet, by performing grossly negligently under the contract, materially breached the contract with Monsoon, Inc." DE 1 at ¶ 112).

Even though Count Three alleging gross negligence and willful misconduct is dismissed pursuant to the economic loss doctrine, this result does not preclude Plaintiffs from proving damages in their breach of contract claim in excess of the amount of the invoice if Plaintiffs can demonstrate gross negligence or willful misconduct.  *See Stewart & Stevenson Services, Inc. v. Pickard*, 749 F.2d 635, 645 (11th Cir. 1984); *Serina v. Albertson's, Inc.*, 744 F.Supp. 1113, 1118 (M.D. Fla. 1990); *Country Club of Miami Corp. v. McDaniel*, 310 So.2d 436 (Fla. Dist. Ct. App. 1975).  Count Three makes sufficient allegations of gross negligence to sustain such an

argument.

Accordingly, in accordance to the discussion above, the Motion to Dismiss Count Three is granted as barred by the economic loss doctrine. Plaintiffs, however, are not barred from seeking damages in excess of the contractual limitation if they can establish gross negligence or willful misconduct of the part of Defendant.

**Count Four: Intentional Misrepresentation/Fraud;**
**Count Five: Negligent Misrepresentation**

The crux of Counts Four and Five is that Defendant intentionally, or at least, in a grossly negligent manner, misrepresented material information throughout the process of the mid-life inspection before, during, and after the contract was signed, upon which Plaintiffs relied, in order to get Plaintiffs' business and to keep its business.  DE 1, ¶¶ 139-146, 154, 158, 160-162.

Defendant argues that these claims all arise out of the alleged breach of contract and claim purely economic damages that arise from the breach.  Plaintiffs respond that their tort claims arise out of separate facts apart from the breach of contract claim because Defendant's unlawful conduct continued throughout its relationship with Plaintiffs, including before the contract was in place, and after Defendant completed the mid-life inspection.  "Whereas Monsoon's breach of contract claims center on BizJet's failure to properly perform the mid-life inspection as required by the contract, Monsoon's fraud and negligent misrepresentation claims center on the promises Monsoon made before the parties entered the agreement as

well as after the job was complete."  Response, DE 13 at 13.

Regardless of when the alleged misrepresentations were made, the question that must be answered is whether the representations at issue concern the heart of the parties' agreement.  *See In re Takata Airbag Products Liability Litigation*, 193 F. Supp. 3d 1324, 1339 (S.D. Fla. 2016) (Moreno, J.) citing *In re Atlas Roofing Corp. Chalet Shingle Prods. Liab. Litig.*, No. 130-md-2495, 2015 WL 3796456, at *3 (N.D. Ga. June 18, 2015); *TRA Farms, Inc. v. Syngenta Seeds, Inc.*, 2014 WL 3844823, at *3 (N.D. Fla. 2014).  In this case, the alleged pre- and post-contract misrepresentations relate exclusively to the Defendant's performance of the contract and cannot therefore be said to give rise to an independent cause of action in tort.  Plaintiffs complain that Defendant committed fraud to get the work by misrepresenting its ability to work on the Tay 611-8C (DE 1, ¶¶ 139-143, 146), by misrepresenting that certain safeguards would be in place that were not (*id.* ¶¶ 144-145), by misrepresenting that it was flawlessly executing the inspection when internally doubts continued regarding its ability to perform the mid-life inspection adequately (*id.* ¶¶ 148-151), by making false inspection certificates to create the appearance that each procedure was carefully performed and inspected (*id.* ¶ 153), and then by withholding crucial information as to the quality of its work once the engine was delivered, including information regarding the risks of flying the Aircraft "so that BizJet could avoid the expense of repairing the Aircraft, as it was contractually obligated to do." (*Id.* at ¶¶ 155-157).

Thus, since Plaintiffs' fraud and misrepresentation claims concern the heart of the parties' agreement, the economic loss rule applies and the Motion to Dismiss Counts Four and Five is granted. *See Tiara*, 110 So.3d at 408 (Pariente, J., concurring) (citing *Lewis*, 428 So.2d at 224); *Altenel*, 947 F. Supp. 2d at 1368-1370. The relief sought in the alternative, for a more definite statement as to the claims for fraud and negligent misrepresentation, is denied as moot.

## Count Six: Punitive Damages

Count Six appears to be a prayer for punitive damages to which Plaintiffs claim entitlement as a result of their fraud and gross negligence claims. Defendant argues Count Six fails to meet the requirements of Rule 8(a) of the Federal Rules of Civil Procedure because it fails to state an independent basis for relief. Punitive damages is not a cause of action, but instead a remedy available under certain circumstances. Because the claims for fraud and gross negligence have been dismissed pursuant to the economic loss doctrine herein, the Motion to Dismiss Count Six is granted.

## Motion to Strike

Defendant moves to strike certain allegations concerning its business operations. The Federal Rules of Civil Procedure provide that "the court may order

stricken from any pleading ... any redundant, immaterial,[3] impertinent[4] or

scandalous[5] matter."  Fed. R. Civ. P. 12(f).  The purpose of a motion to strike is to

clean up the pleadings, remove irrelevant or otherwise confusing materials, and avoid

unnecessary forays into immaterial matters.  *Liberty Media Holdings, LLC v. Wintice

Group, Inc.*, No. 6:10–cv–44–Orl–19GJK, 2010 WL 2367227, *1 (M.D. Fla. June 14,

2010); *Hutchings v. Fed. Ins. Co.*, 2008 WL 4186994 at *2 (M.D. Fla. Sept. 8, 2008).  It

is not intended to procure the dismissal of all or part of a complaint.  *Williams v.

Delray Auto Mall, Inc.*, 289 F.R.D. 697, 700 (S.D. Fla. 2013).  Granting a motion to

strike is a drastic remedy and is disfavored by the courts.  *Nash v. O.R. Colan Group,

LLC,* No. 12–60759–CIV, 2012 WL 4338817, *1 (S.D. Fla. Sept. 20, 2012) (citing

*Thompson v. Kindred Nursing Ctrs. E., LLC*, 211 F. Supp. 2d 1345, 1348 (M.D. Fla.

2002)); *Tracfone Wireless, Inc. v. Access Telecom, Inc.*, 642 F. Supp. 2d 1354, 1361

(S.D. Fla. 2009).  If there is any doubt as to whether under any contingency the

matter may raise an issue, the motion should be denied.  Therefore, a motion to

strike will be granted only if the matter sought to be omitted has no possible

relationship to the controversy, may confuse the issues, or otherwise prejudice a

---

[3]  An allegation is immaterial if it has no value in developing the issues of the
case.  *Oaks v. City of Fairhope, Alabama,* 515 F. Supp. 1004, 1032 (S.D. Ala. 1981)
(citing 2A, Moore's Federal Practice P 12.21(1) at 2420 (2d ed. 1979)).

[4]  An allegation is impertinent if it is irrelevant to the issues and which are not
properly in issue between the parties *Id.*; 2 Moore's Federal Practice, pp. 2312-13.

[5]  A matter is scandalous if it is both grossly disgraceful (or defamatory) and
irrelevant to the action or defense.  Black's Law Dictionary.

party.  5C Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure §
1382 (3d ed. 1998).

Defendant asserts that the Complaint contains a prefatory narrative composed
of a number of scandalous and impertinent allegations designed solely to embarrass
and harass it.  Defendant specifically objects to the allegation that it has "continued
to deteriorate," and references to changes in Defendant's officers and workforce. [DE
1 at p 3].  The Court finds these allegations relate to the controversy and are not
immaterial, impertinent, or scandalous.

Defendant further argues the prefatory narrative in the Complaint should be
stricken because it violates Rule 10(b).  Rule 10(b) of the Federal Rules of Civil
Procedure provides, in pertinent part, that "[a] party must state its claims or
defenses in numbered paragraphs, each limited as far as practicable to a single set of
circumstances."  This rule is designed to protect Defendants by requiring pleadings to
be organized so that the Defendant can make a proper response.

The Court finds that Plaintiffs' Summary of Claims section does not make the
Complaint disorganized or inhibit a proper response from Defendant.  The content
and allegations contained within the Summary of Claims merely summarizes what is
later alleged throughout the Complaint.  There is no risk of confusion and
Defendant's Motion to Strike pursuant to Rule 10(b) is denied.

Defendant also seeks to strike Plaintiffs' request for attorneys' fees because
Plaintiff has failed to allege any statutory or contractual basis that would support

such an award.  Plaintiffs do not address this argument in their response.  There being no applicable statute or contract that would authorize an award of attorney's fees, Defendant's Motion to strike Plaintiffs' request for attorneys' fees is granted, with leave for Plaintiffs to amend the Complaint should they have either a contractual or statutory basis authorizing an award of attorneys' fees in this matter. *See, B & J Holding Corp. v. Weiss*, 353 So.2d 141, 143-44 (Fla. Dist. Ct. App. 1977); *Alfeo v. I-Flow, LLC,* 2012 WL 442981, at *3 (S.D. Fla. 2012).

**Conclusion**

Therefore, in accordance with the conclusions made herein, it is hereby

**ORDERED AND ADJUDGED** that Defendant's Motion to Dismiss, Motion for More Definite Statement, and Motion to Strike [DE 12] is granted in part and denied in part as follows:

It is denied as to Counts One and Two.

It is granted as to Count Three but Plaintiffs may attempt to prove gross negligence and willful misconduct to avoid the Contract's limitation  on damages.

It is granted as to Counts Four, Five and Six.

Counts Three, Four, Five and Six are dismissed with prejudice.  Granting leave to amend would be futile given that the economic loss rule bars these claims.

The alternative Motion for a More Definite Statement is denied as moot.

The Motion to Strike is granted in part and denied in part.  It is denied in all respects except for the request for attorneys' fees, which is stricken without

prejudice.

**DONE AND ORDERED** in Chambers at West Palm Beach, Palm Beach County,

Florida, this 27th day of February, 2017.

_____

KENNETH A. MARRA
United States District Judge